# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

EARLANDO MARIO HARRISON, )
)
    Petitioner, )
)
v. )    Civil Action No. 3:18CV85–HEH
)
B. BAKER, )
)
    Respondent. )

FILED

JAN 3 1 2019

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

## MEMORANDUM OPINION
### (Granting Motion to Dismiss)

Earlando Mario Harrison, a Virginia state prisoner proceeding *pro se*, brings this petition pursuant to 28 U.S.C. § 2254 ("§ 2254 Petition," ECF No. 1) challenging his convictions in the Circuit Court for the City of Hampton, Virginia ("Circuit Court"). Harrison argues that he is entitled to relief on the following grounds:[1]

> Claim One:    "Newly discovered evidence (notarized affidavit)," in which "[t]he alleged victim of the offenses that [Harrison has] been wrongfully convicted of, Jeremy Shelton, voluntarily recanted his accusations of [Harrison] being the person that assaulted him." (§ 2254 Pet. 5.)

> Claim Two:    "Ineffective assistance of counsel" because "[a]fter being made aware of the after-acquired newly discovered evidence and supplied with a copy of it (notarized affidavit), [Harrison's] trial counsel failed to conduct an appropriate investigation or at the least, inform the proper authority of the evidence that cast doubt upon the correctness of the conviction." (*Id.* at 7.)

---

[1] The Court employs the pagination assigned by the CM/ECF docketing system for citations to Harrison's submissions. The Court corrects the spelling, punctuation, capitalization, and spacing in the quotations from Harrison's submissions.

Claim Three:    "Prosecutorial misconduct" because "[a]fter being made aware of the newly discovered evidence and supplied with a copy of it (notarized affidavit), the Commonwealth's Attorney . . . failed to conduct an appropriate investigation or at the least inform the appropriate authority of evidence that exonerates [Harrison] or cast[s] doubt upon the correctness of the conviction." (*Id.* at 8.)

Respondent filed a Motion to Dismiss, asserting that Harrison's claims are procedurally defaulted and lack merit. (ECF No. 10.) Harrison filed a Response. (ECF No. 15.) For the reasons set forth below, Respondent's Motion to Dismiss (ECF No. 10) will be granted. Harrison's § 2254 Petition will be denied because Harrison's claims are procedurally defaulted and without merit.

## I. PROCEDURAL HISTORY

After a jury trial, Harrison was convicted of one count of malicious wounding and one count of use of a firearm in the commission of a felony. (*See* ECF No. 12–1, at 1.) On June 2, 2015, the Circuit Court sentenced Harrison to fifteen years of incarceration.[2] (*Id.* at 1–2.)

Harrison appealed his convictions, challenging "the sufficiency of the evidence to support his convictions of malicious wounding and using a firearm in the commission of a felony." (ECF No. 12–2, at 1.) On December 30, 2015, the Court of Appeals of Virginia denied Harrison's petition for appeal. (*Id.*) In rejecting Harrison's sufficiency

---

[2] The Circuit Court sentenced Harrison to twelve years of incarceration on the charge of malicious wounding and three years of incarceration on the charge of use of a firearm in the commission of a felony, which resulted in an aggregate sentence of fifteen years of incarceration. (ECF No. 12–1, at 3.)

of the evidence arguments for the malicious wounding and use of a firearm in the commission of a felony convictions, the Court of Appeals of Virginia found:

In the early morning hours of July 26, 2014 Jeremy Shelton was shot three times by an assailant who was outside Shelton's Hampton apartment. Shelton sustained gunshot wounds in his hand, shoulder, and head.

Shelton testified that at about 2:30 a.m. on July 26, 2014 he was on the second floor of the apartment on the couch when there was a knock at the door. Shelton tried to look outside to see who was there, but he did not see anyone. Shelton opened the door and looked out over the balcony. He saw a burgundy Jeep Cherokee in the parking lot with a female in the driver's seat. She spotted Shelton, and said, "There he go right there." Appellant, whom Shelton knew, had been getting in the back seat of the vehicle.[3] After the female made the comment, appellant approached Shelton and asked if Shelton remembered him. Appellant was holding a gun wrapped in a shirt. Appellant pinned Shelton to the wall, and Shelton struggled for the weapon. The gun fired, striking Shelton in the finger. Shelton released the firearm and tried to retreat inside the apartment. As he was slipping on the front door mat, Shelton was struck in the head by a second shot. Shelton tried to close the door, but appellant stuck his arm with the gun into the apartment. The gun fired a third time. Afterward, Shelton managed to slam the door. He immediately called for medical assistance.

Shelton testified that the area outside the apartment was well-lit at the time of the shooting. He clearly saw appellant's face, and he was certain appellant was the shooter. Several days after the shooting, Shelton identified appellant as the assailant from a photographic lineup. Initially, however, Shelton lied to the police and said he could not identify the shooter. Shelton said he lied because he was angry and intended to seek revenge against appellant himself. He later changed his mind and decided to cooperate with the police. Appellant admitted having a prior felony conviction for drugs, and said he was uncomfortable working with the police.

The police made telephone contact with appellant, and he promised to come to the police department. However, appellant did not turn himself in until September 2014. When the police then questioned appellant, he said he was with his wife, Starro Harrison, at the date and time of the shooting. Within days of the shooting, the police had gone to Harrison's townhouse on Cape Dorey Drive with warrants for appellant's arrest. Harrison denied that appellant was living there or had been with her at the time of the shooting.

---

[3] Shelton testified that he and appellant had mutual friends, and he knew appellant as "P. Stocks." In Shelton's last conversation with appellant, about six months before the shooting, appellant asked Shelton if he knew of someone they could rob.

The police searched the townhouse and found no sign that a male was living there.

Testifying in his own behalf, appellant said he was living with Harrison at the townhouse on July 26, 2014, and he was at home with her at the time of the shooting. He denied that he was the person who shot Shelton. Appellant admitted having prior felony convictions.

Harrison testified appellant was living with her on July 26, 2014, and many of his belongings were in boxes in the dining room. Harrison claimed appellant was home with her at the time of the shooting. She said that when the police came to her home on July 27, 2014 she was afraid, so she falsely told them appellant did not live there and she had not seen him in about a week.

Appellant contends the evidence was insufficient to prove that he was the person who shot Shelton. However, the jury accepted the Commonwealth's evidence, and rejected the appellant's alibi defense. "The credibility of the witnesses and the weight accorded the evidence are matters solely for the fact finder who has the opportunity to see and hear evidence as it is presented." *Sandoval v. Commonwealth*, 20 Va. App. 133, 138, 455 S.E.2d 730, 732 (1995). "In its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt." *Marable v. Commonwealth*, 27 Va. App. 505, 509–10, 500 S.E.2d 233, 235 (1998). Moreover, the trial court was permitted to consider appellant's prior felony convictions in assessing his credibility. *See* Code § 19.2–269.

Shelton identified appellant, with whom he was acquainted, as the person who shot him. Shelton stated he was certain of his identification, and there was nothing to prevent him from having a clear view of the shooter. Shelton explained his initial reluctance to identify appellant and cooperate with the police. Considering all of the facts and circumstances, the evidence was sufficient to prove beyond a reasonable doubt that appellant was the person who shot Shelton and that appellant was guilty as charged.

(*Id.* at 1–3 (footnote number changed).) On January 18, 2017, the Supreme Court of Virginia refused the petition for appeal. (ECF No. 12–3, at 1.)

On February 13, 2017, Harrison filed a petition for a writ of actual innocence based on nonbiological evidence in the Court of Appeals of Virginia. (ECF No. 12–4, at 1–35.) Harrison based his claim of innocence on the "GPS coordinates of [his] cellular

phone." (*Id.* at 2.) On February 28, 2018, the Court of Appeals of Virginia summarily

dismissed the petition, holding, in pertinent part:

> In support of his petition, petitioner supplies copies of records obtained from Sprint Corporation relating to the usage of his cell phone. Petitioner maintains that the records demonstrate he was not present at the location where the victim was shot on July 26, 2014. He contends the records corroborate the alibi evidence he presented at trial.
>
> Documents supplied by petitioner show that, prior to petitioner's sentencing, his attorney filed a request to obtain the phone records from Sprint by subpoena *duces tecum.* Pursuant to that subpoena, Sprint provided the records pertaining to the phone to the trial court clerk on April 24, 2015. Thus, the evidence upon which petitioner now relies was both known and available to petitioner and his attorney before his convictions became final in the trial court. Accordingly, the evidence does not meet the requirements of Code § 19.2–327.11(a)(iv).

(ECF No. 12–5, at 2.)

On March 2, 2017, Harrison filed a petition for a writ of habeas corpus in the

Circuit Court. (ECF No. 12–6, at 1, 15.) In his state habeas petition, Harrison raised the

following claims for relief:

> a. Prosecutorial Misconduct: (1) Knowingly used perjured testimony to wrongfully/maliciously pursue conviction. (2) Allowed government witness to appeal to the emotions of the jury. (3) Misstatements within summation and during trial presented reversible error. (See attached pages)
> b. Ineffective Assistance of Counsel: (1) Failed to obtain requested material evidence. (2) Failed to object to government witness statements and gestures that appealed to the emotions of the jury. (3) Failed to request evidentiary hearing to exclude/suppress perjured testimony and pretrial identification. (See attached pages)
> c. Lack of Probable Cause to Obtain Arrest Warrants: (1) Police neglected to collect DNA evidence from the crime scene that would have excluded [Harrison] as a suspect. (2) Police neglected to do background check on alleged victim. (3) Police neglected to obtain GPS evidence that would have excluded [him] as a suspect. (See attached pages)

(*Id.* at 4–5.) The Circuit Court also construed Harrison's state habeas petition to raise the following two additional ineffective assistance of counsel claims: "counsel failed to move for a *Franks*[4] hearing," and "counsel failed to object to improper statements in the prosecutor's closing argument." (*See* ECF No. 12–8, at 4.) On July 26, 2017, the Circuit Court denied and dismissed Harrison's petition on the merits. (*Id.* at 16–17.) Harrison did not appeal the Circuit Court's denial of his state habeas petition.

On January 21, 2018, Harrison filed a petition for a writ of habeas corpus in the Supreme Court of Virginia and a "motion to file a writ of habeas corpus." (*See* ECF No. 12–9, at 1 (internal quotation marks omitted).) In Harrison's petition, he raised the following claims for relief:

> a. Newly discovered evidence that proves my innocence beyond a shadow of a doubt and when viewed in light of the evidence as a whole would be sufficient to establish by clear and convincing evidence that no reasonable fact finder would have found me guilty of the offenses.
> b. Prosecutorial Misconduct: The Commonwealth's Attorney failed to investigate or inform the appropriate authority of the after acquired evidence after being made aware of its existence and being supplied with a copy of the evidence.
> c. Ineffective Assistance of Counsel: My trial counsel failed to conduct an appropriate investigation or to alert the proper authority of the after acquired evidence after being made aware of its existence and being supplied with a copy of the evidence.

(*Id.* at 4–5.) On March 26, 2018, the Supreme Court of Virginia dismissed Harrison's petition as untimely, finding that "the petition was not filed within [one] year from the January 18, 2017, final disposition of petitioner's direct appeal." (*Id.* at 1 (citing Va. Code Ann. § 8.01–654(A)(2)).) The Supreme Court of Virginia also denied "the relief

---

[4] *Franks v. Delaware*, 438 U.S. 154 (1978).

requested in the petitioner's 'motion to file a writ of habeas corpus.'" (*Id.*) On February 2, 2018, the Court received the instant § 2254 Petition. (§ 2254 Pet. 1.)

## II. EXHAUSTION AND PROCEDURAL DEFAULT

Before a state prisoner can bring a § 2254 petition in federal district court, the prisoner must first have "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). State exhaustion "is rooted in considerations of federal-state comity," and in Congressional determination via federal habeas laws "that exhaustion of adequate state remedies will 'best serve the policies of federalism.'" *Slavek v. Hinkle*, 359 F. Supp. 2d 473, 479 (E.D. Va. 2005) (some internal quotation marks omitted) (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 491–92 & n. 10 (1973)). The purpose of exhaustion is "to give the State an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Picard v. Connor*, 404 U.S. 270, 275 (1971) (internal quotation marks omitted). Exhaustion has two aspects. First, a petitioner must utilize all available state remedies before the petitioner can apply for federal habeas relief. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 844–48 (1999). As to whether a petitioner has used all available state remedies, the statute notes that a habeas petitioner "shall not be deemed to have exhausted the remedies available in the courts of the State . . . if he has the right under the law of the State to raise, by any available procedure, the question presented." 28 U.S.C. § 2254(c).

The second aspect of exhaustion requires a petitioner to have offered the state courts an adequate "opportunity" to address the constitutional claims advanced on federal habeas. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (internal quotation marks omitted)

7

(quoting *Duncan v. Henry*, 513 U.S. 364, 365–66 (1995)). "To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Id.* Fair presentation demands that a petitioner present "both the operative facts and the controlling legal principles" to the state court. *Longworth v. Ozmint*, 377 F.3d 437, 448 (4th Cir. 2004) (internal quotation marks omitted) (quoting *Baker v. Corcoran*, 220 F.3d 276, 289 (4th Cir. 2000)). The burden of proving that a claim has been exhausted in accordance with a "state's chosen procedural scheme" lies with the petitioner. *Mallory v. Smith*, 27 F.3d 991, 994–95 (4th Cir. 1994).

"A distinct but related limit on the scope of federal habeas review is the doctrine of procedural default." *Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998). This doctrine provides that "[i]f a state court clearly and expressly bases its dismissal of a habeas petitioner's claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal, the habeas petitioner has procedurally defaulted his federal habeas claim." *Id.* (citing *Coleman v. Thompson*, 501 U.S. 722, 731–32 (1991)). A federal habeas petitioner also procedurally defaults claims when he or she "fails to exhaust available state remedies and 'the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now

find the claims procedurally barred.'" *Id.* (quoting *Coleman*, 501 U.S. at 735 n.1).[5] The burden of pleading and proving that a claim is procedurally defaulted rests with the state. *Jones v. Sussex I State Prison*, 591 F.3d 707, 716 (4th Cir. 2010) (citations omitted). Absent a showing of cause and prejudice or a fundamental miscarriage of justice, this Court cannot review the merits of a defaulted claim. *See Harris v. Reed*, 489 U.S. 255, 262 (1989).

In Harrison's § 2254 Petition, he raises the same three claims that he presented to the Supreme Court of Virginia in his January 21, 2018 state habeas petition. (§ 2254 Pet. 5, 7–8; ECF No. 12–9, at 1, 4–5.) The Supreme Court of Virginia dismissed Harrison's state habeas petition because "the petition was not filed within [one] year from the January 18, 2017, final disposition of petitioner's direct appeal." (ECF No. 12–9, at 1 (citing Va. Code Ann. § 8.01–654(A)(2)).) "Virginia Code § 8.01–654(A)(2) constitutes an adequate and independent state-law procedural rule." *Baker v. Clarke*, 95 F. Supp. 3d 913, 917 (E.D. Va. 2015). Thus, Harrison's claims in his § 2254 Petition are defaulted.

Harrison argues that the Supreme Court of Virginia incorrectly based its dismissal on the untimeliness of his petition because under 28 U.S.C. § 2244(d)(1), he was permitted to file his state habeas petition "within one year of the date which the facts supporting the claims (newly-discovered evidence) was discovered and obtained." (ECF

---

[5] Under these circumstances, even though the claim has not been fairly presented to the Supreme Court of Virginia, the exhaustion requirement is "technically met." *Hedrick v. True*, 443 F.3d 342, 364 (4th Cir. 2006) (citing *Gray v. Netherland*, 518 U.S. 152, 161–62 (1996)).

No. 15, at 2.) However, Harrison is incorrect. Va. Code. Ann. § 8.01–654(A)(2)[6]

governs the timeliness of state habeas petitions, including Harrison's habeas petition in

the Supreme Court of Virginia, and 28 U.S.C. § 2244(d)(1)[7] applies to federal habeas

petitions. Moreover, Harrison acknowledges that he received the "newly-discovered

---

[6] Va. Code Ann. § 8.01–654(A)(2) provides, in pertinent part:

> .... A habeas corpus petition attacking a criminal conviction or sentence . . . shall be filed within two years from the date of final judgment in the trial court or within one year from either final disposition of the direct appeal in state court or the time for filing such appeal has expired, whichever is later.

Va. Code Ann. § 8.01–654(A)(2) (West 2018).

[7] Section 101 of the Antiterrorism and Effective Death Penalty Act amended 28 U.S.C. § 2244 to establish a one-year period of limitation for the filing of a petition for a writ of habeas corpus in federal court by a person in custody pursuant to the judgment of a state court. Specifically, 28 U.S.C. § 2244(d) now reads:

1.  A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of --
    (A)  the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
    (B)  the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
    (C)  the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
    (D)  the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
2.  The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).

evidence" on April 2, 2017 when he received an affidavit from the victim, Jeremy

Shelton. (ECF No. 15, at 3.) Harrison fails to explain, and the Court fails to discern, why

he waited until January 21, 2018 to present claims regarding this "newly discovered

evidence" in a state habeas petition in the Supreme Court of Virginia. (*See* ECF

No. 12–9, at 1–12.) Nevertheless, because Harrison presents a claim of actual innocence

in Claim One, and subscribing to Harrison's claim of actual innocence would permit the

Court to consider the merits of his otherwise procedurally defaulted claims, the Court

first addresses Claim One. *See Buckner v. Polk*, 453 F.3d 195, 199 (4th Cir. 2006)

(citations omitted).

### III. CLAIM ONE – ACTUAL INNOCENCE

In Claim One, Harrison contends that there is "[n]ewly discovered evidence

(notarized affidavit)," in which "[t]he alleged victim of the offenses that [Harrison has]

been wrongfully convicted of, Jeremy Shelton, voluntarily recanted his accusations of

[Harrison] being the person that assaulted him." (§ 2254 Pet. 5.) In Harrison's

Response, he states, for the first time, that he "prays that the Court conducts an

evidentiary hearing in regards to the above-referenced civil action." (ECF No. 15, at 5.)

The Court construes Claim One to be a claim of actual innocence.

As an initial matter, it is unclear whether habeas petitioners may raise freestanding

actual innocence claims.[8] *See McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013) (citation

---

[8] With respect to whether a habeas petitioner may raise a freestanding claim of actual innocence, "Fourth Circuit authority on this issue is inconclusive and conflicting." *Hazel v. United States*, 303 F. Supp. 2d 753, 760 (E.D. Va. 2004) (citing *Royal v. Taylor*, 188 F.2d 239, 243 (4th Cir. 1999); *Hunt v. Dade*, No. 98–6808, 2000 WL 219755, at *2 (4th Cir. Feb. 25, 2000)).

omitted) ("[The Supreme Court] [has] not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence."). Nevertheless, "[c]laims of actual innocence, whether presented as freestanding ones, or merely as gateways to excuse a procedural default, should not be granted casually." *Wilson v. Greene*, 155 F.3d 396, 404 (4th Cir. 1998) (citations omitted). Further, the Supreme Court has "described the threshold for any hypothetical freestanding innocence claim as 'extraordinarily high.'" *House v. Bell*, 547 U.S. 518, 555 (2006) (quoting *Herrera v. Collins*, 506 U.S. 390, 417 (1993) (finding that "whatever burden a hypothetical freestanding innocence claim would require," even a petitioner who "cast considerable doubt on his guilt—doubt sufficient to satisfy *Schlup*'s[9] gateway standard for obtaining federal review despite a state procedural default," would likely not satisfy it).

Here, the Court reviews Harrison's arguments under the more lenient standard for gateway actual innocence claims, because if Harrison satisfies this standard, the Court would be permitted to consider the merits of his otherwise procedurally defaulted claims. Even under the more lenient standard for gateway actual innocence claims, Harrison may obtain review of his claims "only if he falls within the 'narrow class of cases . . . implicating a fundamental miscarriage of justice.'" *Schlup v. Delo*, 513 U.S. 298, 314–15 (1995) (alteration in original) (quoting *McCleskey v. Zant*, 499 U.S. 467, 494 (1991)).

---

[9] *Schlup v. Delo*, 513 U.S. 298 (1995).

A gateway claim requires a petitioner to present "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Id.* at 324. "Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." *Id.* If a petitioner meets the burden of producing new, truly reliable evidence of his or her innocence, the Court then considers "'all the evidence,' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial,'" and determines whether the petitioner has met the standard for a gateway claim of innocence. *House*, 547 U.S. at 538 (quoting *Schlup*, 513 U.S. at 327–28). The Court must determine "whether 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *Sharpe v. Bell*, 593 F.3d 372, 377 (4th Cir. 2010) (quoting *Schlup*, 513 U.S. at 327–28). "The Court need not proceed to this second step of the inquiry unless the petitioner first supports his or her claim with evidence of the requisite quality." *Hill v. Johnson*, No. 3:09cv659, 2010 WL 5476755, at *5 (E.D. Va. Dec. 30, 2010) (citing *Weeks v. Bowersox*, 119 F.3d 1342, 1352–53 (8th Cir. 1997); *Feaster v. Beshears*, 56 F. Supp. 2d 600, 610 (D. Md. 1999)).

Moreover, "actual innocence" means factual innocence and not just legal insufficiency. *See Calderon v. Thompson*, 523 U.S. 538, 559 (1998) (alteration in original) (citations and internal quotation marks omitted) ("[T]he miscarriage of justice exception is concerned with actual as compared to legal innocence."). Furthermore, with respect to claims of actual innocence,

The Supreme Court has instructed that, "when considering an actual-innocence claim in the context of a request for an evidentiary hearing, the District Court need not 'test the new evidence by a standard appropriate for deciding a motion for summary judgment,' but rather may 'consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence.'"

*Carter v. Commonwealth of Va.*, No. 3:09CV121–HEH, 2010 WL 331758, at *4 (E.D.

Va. Jan. 26, 2010) (quoting *House*, 547 U.S. at 537).

### A. Summary of the Evidence Presented at Trial

#### 1. Evidence Presented by the Commonwealth of Harrison's Guilt

While the evidence against Harrison introduced at trial was not overwhelming,

substantial and compelling evidence existed to support the jury's verdict. The jury heard

testimony from the following individuals at trial: Jeremy Shelton, the victim of the

shooting who identified Harrison as the shooter; Detective LePage, a detective who

administered a photo lineup, which resulted in Shelton identifying Harrison as the

shooter; Detective Forbes, a detective investigating the case; Officer Long, the first police

officer to respond to the scene of the crime; Starro Harrison, Harrison's wife; and

Harrison.

Shelton testified that at approximately 2:30 a.m. on July 26, 2014 he was at his

apartment, and there was "a knock at [his] door" using the "little door knocker thing."

(Feb. 19, 2015 Tr. 138–39, 142.) Shelton stated that he "kind of got a suspicion

something wasn't right, because it's 2:30 a.m. in the morning and nobody ever uses the

little door knocker thing." (Feb. 19, 2015 Tr. 142–43.) When Shelton looked through the

peephole in the door, he did not see anyone. (Feb. 19, 2015 Tr. 143.) Shelton then

opened the door, and looked over the balcony. (Feb. 19, 2015 Tr. 143.) Shelton testified

that the female driver of a truck stated, "'There he go right there.' And Mr. Earlando, he

had the back door open and [was] about to get in the truck, and when he looked up and

saw [Shelton], he closed the door and he came back up the steps." (Feb. 19, 2015

Tr. 144.) Shelton then testified:

> So [Harrison] came up to me. He said, "You don't remember me?" I said,
> "I remember you. What's up?" And then he backed up about 10 feet, and
> he -- I wasn't sure it was a gun at the time, because he had it wrapped up in
> a black shirt. So he pulled it at me, and the next thing I know I had him
> pinned up against the wall, and that's when one shot went off through the
> ceiling and hit my finger a little bit . . . .

(Feb. 19, 2015 Tr. 144.) Shelton testified that he tried to run back in the apartment, and

as he did so, there was a second shot. (Feb. 19, 2015 Tr. 144–45.) Then there was a third

shot when "[Harrison] stuck his arm through the door." (Feb. 19, 2015 Tr. 145.) Shelton

was then able to shut the door, and he "heard [Harrison] running downstairs, and [he]

heard the tires squeal off, and [he] called the ambulance." (Feb. 19, 2015 Tr. 145.)

Shelton testified that he knew Harrison as "P. Stocks," and that he and Harrison

had "a few mutual friends." (Feb. 19, 2015 Tr. 147.) Shelton further testified that

approximately five or six months before the shooting, he had a conversation with

Harrison at a party. (Feb. 19, 2015 Tr. 147–48.) Shelton testified that at the party,

Harrison first asked Shelton "if [he] had weed, because [Shelton] used to sell weed[,] . . .

[and] was known as Weed Man." (Feb. 19, 2015 Tr. 149.) Harrison also asked Shelton if

he knew of anyone to rob, stating: "'Well, I know you still got the plug. So you know

somebody you don't [expletive] with we can lick?'" (Feb. 19, 2015 Tr. 149–50.)

Shelton explained that "[t]he plug is the weed supplier or the drug supplier," and asking if there was someone "we can lick" was the equivalent of asking whether Shelton knew of someone that he no longer associated with that Harrison could rob. (Feb. 19, 2015 Tr. 150.) Shelton stated that this was "the last conversation" he had with Harrison before the shooting. (Feb. 19, 2015 Tr. 151.)

With respect to Shelton's identification of Harrison, Shelton testified that the shooting occurred in a well-lit area. (Feb. 19, 2015 Tr. 151), and the shooter did not have anything obstructing his face, meaning Shelton was able to see Harrison's face and identify him (Feb. 19, 2015 Tr. 152). Shelton acknowledged that he was not forthcoming when the police responded to his apartment and, at first, he told the police that he did not know the shooter's identity because "[he] was mad" and "wanted to get [Harrison] [himself]." (Feb. 19, 2015 Tr. 154.) Shelton explained that "[he] was going to retaliate [himself]" because he did not think the police "were going to catch [Harrison] anyways." (Feb. 19, 2015 Tr. 155.)

Shelton testified that after the shooting, he was transported to the hospital. (Feb. 19, 2015 Tr. 155.) At the hospital, the police again asked him who had shot him, and Shelton "told them [he] didn't know [the shooter's] name, but . . . [he] described him" as "between five seven and five nine," "dark-skinned, goatee, a hundred and 30 pounds." (Feb. 19, 2015 Tr. 156.) Shelton testified: "I mean, it's [Harrison's] description. I just didn't give [the police officer] [Harrison's] name, because at the time I didn't know his government name. I [knew] his slang name, . . . P. Stocks." (Feb. 19, 2015 Tr. 156.) Shelton testified that he was estimating Harrison's height, explaining that Shelton is "six

16

feet," and the shooter "was shorter than [him], but [he] didn't have on shoes." (Feb. 19, 2015 Tr. 156–57.)

Shelton testified that after he left the hospital, he spoke with Detective Forbes for the first time, and provided Detective Forbes with information regarding Harrison's identity. (Feb. 19, 2015 Tr. 157, 167.) Shelton explained that "it took a few days for [him] to get over the anger and start thinking like a mature adult." (Feb. 19, 2015 Tr. 157.) With respect to the information that Shelton provided to Detective Forbes regarding Harrison's identity, Shelton testified that because the police had taken his phone as evidence, he had a "friend of [his] forward a picture [of Harrison from Facebook] to Detective Forbes." (Feb. 19, 2015 Tr. 158.)

Shelton acknowledged that he did not tell Detective Forbes that he knew Harrison or about the incident at the party with Harrison because "at the time [he] didn't really think it was really relevant for one . . . and, two, [Detective Forbes] didn't really ask a lot of questions that -- that required [him] giving [such] an answer." (Feb. 19, 2015 Tr. 165.) Shelton also acknowledged that he did not want the police to know that he had previously sold marijuana, explaining: "it was 2009 when it -- when the whole weed thing took place. So I thought it was kind of relevant too, but that it maybe one of the reasons I was the victim." (Feb. 19, 2015 Tr. 166.) Shelton further acknowledged that he is a convicted felon, and that his felony was for "[p]ossession of marijuana with intent to distribute." (Feb. 19, 2015 Tr. 166.) Shelton also acknowledged that he was not forthcoming at the preliminary hearing. (*See, e.g.*, Feb. 19, 2015 Tr. 180, 196.) Shelton explained that this was the first time he was a victim in a case and his first time working

with the police and prosecutors, and that he was "[r]eally uncomfortable." (Feb. 19, 2015 Tr. 169.) When asked, Shelton denied that there was any other reason that he named Harrison as the shooter other than "[b]ecause that's the person that shot [him]." (Feb. 19, 2015 Tr. 220.) Shelton explained that he was "telling this jury that Earlando Harrison" shot him three times "[b]ecause that's the person that shot [him]." (Feb. 19, 2015 Tr. 220–21.)

On cross-examination, defense counsel repeatedly questioned Shelton's credibility and his testimony on direct examination. (*See, e.g.*, Feb. 19, 2015 Tr. 195–96, 201–13, 217–18.) For example, on cross-examination, Shelton again acknowledged that he had lied to the police when he told them that he did know the identity of the shooter, and that he had lied at the preliminary hearing when he testified that he had not lied to the police. (Feb. 19, 2015 Tr. 195–96.)

Next, Detective LePage of the Hampton Police Department testified. (Feb. 19, 2015 Tr. 223.) Detective LePage testified that his involvement in the investigation of the shooting of Shelton was limited to "[d]oing a photo lineup." (Feb. 19, 2015 Tr. 224.) Detective LePage testified that he conducted the photo lineup because "an officer who has no involvement with the case at all conducts a lineup, so there could be no, . . . prejudice." (Feb. 19, 2015 Tr. 225.)

Detective Forbes of the Hampton Police Department then testified. (Feb. 19, 2015 Tr. 235.) Detective Forbes testified that he first spoke with Shelton after Shelton left the hospital. (Feb. 19, 2015 Tr. 237.) Detective Forbes also testified that he created the photo lineup that Detective LePage had used. (Feb. 19, 2015 Tr. 239–40.) Detective

Forbes testified that the result of the photo lineup was that Shelton identified Harrison. (Feb. 19, 2015 Tr. 240.) Detective Forbes also testified that, in his experience investigating homicides and violent crimes, that victims do not want to cooperate with the police, and he estimated that of 1100 cases that he had worked on, "probably half of [the victims] . . . didn't want the police involved." (Feb. 19, 2015 Tr. 294.)

Additionally, Detective Forbes testified that after Harrison was identified, he attempted to find Harrison. (Feb. 19, 2015 Tr. 245.) Detective Forbes stated that he went to the address that was "listed in the computer" for Harrison, and when he went to the address, Harrison was not there. (Feb. 19, 2015 Tr. 245.) Instead, Harrison's wife, Starro, was at the address. (Feb. 19, 2015 Tr. 246.) Harrison's wife gave permission to the police to access the townhouse, and the police searched the residence. (Feb. 19, 2015 Tr. 246.) Detective Forbes testified that it did not appear that Harrison lived at the address because he "didn't see men's belongings." (Feb. 19, 2015 Tr. 247.) Detective Forbes also testified that Harrison's wife told him that "she had not seen [Harrison], and he [did] not reside at this address," and that "[i]t had been quite some time" since she had seen Harrison. (Feb. 19, 2015 Tr. 292.) Detective Forbes testified that he provided Harrison's wife with his telephone number and "the Crime Line phone numbers and explained to her that [he] needed to see [Harrison]." (Feb. 19, 2015 Tr. 247.) Detective Forbes testified that Harrison's wife "was very cooperative." (Feb. 19, 2015 Tr. 247.) Within forty-eight hours of speaking with Harrison's wife, Detective Forbes received a telephone call from Harrison, and Harrison indicated that he would turn himself in "[t]omorrow or the next day." (Feb. 19, 2015 Tr. 249.) Harrison did not turn himself in

19

until approximately six weeks later on September 17, 2014. (Feb. 19, 2015 Tr. 249.)

Harrison had told the police that he wanted to wait to turn himself in because a family

member was ill and he did not want to miss his daughter's birthday, and he again gave

this explanation to the police when he turned himself in. (Feb. 19, 2015 Tr. 250–51.)

Upon turning himself in, Harrison was arrested. (Feb. 19, 2015 Tr. 251.) After

Harrison was arrested and read his rights, he agreed to speak with the police. (Feb. 19,

2015 Tr. 252.) When asked, Harrison indicated that he had been "[a]t 117 Cape Dorey

Drive with [his] wife" on July 26, 2014, the night of the shooting. (Feb. 19, 2015

Tr. 252.) Detective Forbes testified that this was the same address that he had searched

and where he "saw no men's belongings." (Feb. 19, 2015 Tr. 252–53.) Detective Forbes

testified that Harrison initially indicated that he did not know Shelton; however, Harrison

then admitted that he knew Shelton by his nickname "P." (Feb. 19, 2015 Tr. 253–54.)

Harrison also admitted that he had met Shelton at a "get-together, a party, with some

people" in Newport News "a year or so prior." (Feb. 19, 2015 Tr. 254.) When asked,

Harrison explained that he knew Shelton "[t]hrough a guy named 'C,' Corey." (Feb. 19,

2015 Tr. 255 (some internal quotation marks omitted).) Detective Forbes testified that

the information provided by Harrison regarding how he knew Shelton was corroborated

with the information provided by Shelton "[a]lmost word for word." (Feb. 19, 2015

Tr. 255.) When asked, Harrison indicated that there were no issues between him and

Shelton. (Feb. 19, 2015 Tr. 255.)

## 2. Harrison's Alibi Defense at Trial

Starro Harrison, Harrison's wife, testified that she and Harrison had been married six years.[10] (Feb. 19, 2015 Tr. 317). Ms. Harrison testified that when police officers came to her home, she allowed them to search the home. (Feb. 19, 2015 Tr. 320–21.) Ms. Harrison testified that Harrison's "personal effects [were] in the home." (Feb. 19, 2015 Tr. 321.) Ms. Harrison stated that "[he] had shoes, socks, underwear, pants, shirts, um, coats. He lives there. So everything he owns, his tattoo bags, things like that." (Feb. 19, 2015 Tr. 321–22.) Ms. Harrison explained that they "were trying to move at the time when this incident happened," and she had "boxes all over." (Feb. 19, 2015 Tr. 326.) Ms. Harrison also explained that "[her] 14-year-old and [her] husband [are] the same size. So [she] [didn't] know how [the police] would be able to determine if whether it's [her] husband's clothes or [her] 14-year-old son's clothes." (Feb. 19, 2015 Tr. 326.)

Ms. Harrison testified that she was not honest with the police at the time when she "told them [she] [hadn't] seen him in about a week." (Feb. 19, 2015 Tr. 322.) Ms. Harrison further testified: "He comes every day [to the home]. He -- he was there or he had been there the whole weekend. We had been together some since Friday." (Feb. 19, 2015 Tr. 322–23.) Ms. Harrison explained that she "didn't know the severity of the -- of

---

[10] Officer Long of the Hampton Police Department, Starro Harrison, and Harrison were the three witnesses called by the defense. Officer Long testified that he was "the first officer on scene" on the night of July 26, 2014. (Feb. 19, 2015 Tr. 304–05.) Officer Long testified, *inter alia*, that when he asked Shelton who had shot him, Shelton indicated that he did not know who had shot him. (Feb. 19, 2015 Tr. 305.) Officer Long also testified that he asked Shelton a second time, and Shelton gave the same response. (Feb. 19, 2015 Tr. 305.)

what was going on" and "wasn't being honest" with the police officers. (Feb. 19, 2015 Tr. 334.)

Harrison also testified at the trial. (Feb. 19, 2015 Tr. 336.) Harrison testified that he did not have a "beef" with Shelton, stating: "[m]e and Mr. Shelton haven't said over five words to one another." (Feb. 19, 2015 Tr. 336.) Harrison also testified that he does not have a gun, and the last time he had a gun was 2002. (Feb. 19, 2015 Tr. 336–37.) Harrison explained that he knew that 2002 was the last time he had a gun "[b]ecause [he] was convicted of possession of a firearm, and [he] had to do six years for it." (Feb. 19, 2015 Tr. 337.) Harrison testified that he "know[s] Jeremy Shelton as the guy that supplies marijuana and cocaine to a guy named Corey. Corey was roommates with a cousin of [Harrison's]." (Feb. 19, 2015 Tr. 337.) Harrison also testified: "Um, me and Corey been hanging together around maybe two, three times out of the month, get together, smoke weed, drink beer, play the Xbox, and I watch Youtube videos, and stuff like that." (Feb. 19, 2015 Tr. 338.)

Harrison testified that he had only been in "Mr. Shelton's presence two times. The first time [was] when[] . . . Corey was staying on Huntington on the James Apartments, in Newport News, on Warwick," and at that time, "Mr. Shelton came over to his house and brought us some black market shoes that he was selling out the back of his trunk." (Feb. 19, 2015 Tr. 338.) Harrison testified:

> The second time was when [Shelton] came to Corey's house and Corey was staying in Buckroe with his mother. . . .
>     . . . .

He came over there, brought a big bag of -- a black trash bag full of marijuana, showed Corey some, said, "What's up?" talked to Corey for a little while, and then he left.

Other than that, I haven't seen him since.

(Feb. 19, 2015 Tr. 338–39.) Harrison testified that he was not the person who shot

Shelton, stating: "It's not in my character, not in my heart to just go around shooting

people for no reason. I wouldn't risk my freedom being away from my baby girl and my

wife. No." (Feb. 19, 2015 Tr. 346.)

On cross-examination, Harrison admitted that he is a three-time convicted felon.

(Feb. 19, 2015 Tr. 349.) Harrison testified that at the time of the incident, he did not have

a job, but that he "do[es] tattoos." (Feb. 19, 2015 Tr. 354.) Harrison denied having a

conversation with Shelton about robbing someone, and indicated that Shelton had made

up the conversation. (Feb. 19, 2015 Tr. 357–58.) However, Harrison admitted that he

knew that the term "plug" meant "somebody you get drugs from" and that the term "lick"

meant "to rob someone," both of which were terms Shelton indicated were used in the

conversation he had with Harrison. (Feb. 19, 2015 Tr. 357–58.) When asked about an

"M" symbol that Harrison had displayed with his hands in a Facebook post, Harrison

testified that the "M" stands for money. (Feb. 19, 2015 Tr. 364.) When asked if he was

"about getting money," Harrison responded: "Of course. Why wouldn't I be? I got a

daughter to take care of." (Feb. 19, 2015 Tr. 364.) When asked, "[s]o you're about

getting money, but you don't have a job[,]" Harrison stated: "I do tattoos." (Feb. 19,

2015 Tr. 364.)

**B.      Cell Phone Records**

Following Harrison's trial, but before his sentencing, Harrison's counsel, "filed a request to obtain [Harrison's] phone records from Sprint by subpoena *duces tecum*." (*See* ECF No. 12–5, at 2.) Sprint provided the records to the Circuit Court on April 24, 2015. (*See id.*; ECF No. 12–4, at 24.)

Harrison contends that his cell phone records "corroborate[] with [his] alibi, [his] testimony and the testimony of [his] defense witness during trial as to [his] whereabouts before, during and after the time Mr. Jeremy Shelton was assaulted on July 26th, 2014." (ECF No. 12–4, at 6.) In the materials submitted in support of his petition for a writ of actual innocence, which he filed in the Court of Appeals of Virginia, Harrison states:

> The tower reception code closest to where Mr. Shelton was assaulted never showed up on my phone records due to the fact that I was never in that area. I had remained in the immediate area of my residence from July 25th, 2014 until July 27th, 2014. The GPS/tower reception codes corroborates with my statements to the detective, my testimony and the testimony of my defense witness at trial . . . that I was at home the entire weekend . . . .

(*Id.*) The cell phone records from Sprint, which are attached to Harrison's petition for a writ of actual innocence, show that there was no activity on Harrison's cell phone from 12:47 p.m. on July 25, 2014 until 11:08 a.m. on July 26, 2014. (*Id.* at 8.) Thus, the records do not support an alibi. Rather, the records reflect that the phone was not used in the hours before and after Harrison shot Shelton.

**C.      Harrison's New Evidence of Innocence – Affidavit of Jeremy Shelton**

In support of Harrison's actual innocence claim, he contends that there is "[n]ewly discovered evidence" in the form of a "notarized affidavit" in which "[t]he alleged

victim[,] . . . Jeremy Shelton, voluntarily recant[s] his accusations of [Harrison] being the person that assaulted him." (§ 2254 Pet. 5.) In the affidavit, Shelton states, in sum:

> I[,] Jeremy Shelton, give full truth, by God, that the following contents to be the truth the whole truth and nothing but the truth.
>
> . . . . . . I[,] Jeremy Shelton, hereby provide this statement holding sound mind, body, & soul that I lied on Mr. Earlando M. Harrison about him being the person who came to my residence and shot me the night of July 27, 2014.
>
> I gave the testimony of Mr. Earlando M. Harrison being the one who shot me under the constant pressure of everyone else around me saying that they believe Mr. Earlando M. Harrison shot me.
>
> Although I seen for myself who the shooter was, and gave an accurate description of the real shooter in my initial statement with law enforcement. (Mr. Earlando M. Harrison is not the individual that came to my residence and shot me.)
>
> . . [.] I would like for this signed affidavit to reflect my sincere and most deepest apology to Mr. Earlando M. Harrison, for the blatant and wrongful lie, to the daughter and family of Mr. Earlando M. Harrison as well. I hope that Mr. Earlando M. Harrison can find it in his heart to forgive me as well as the family of Mr. Harrison. . . . I could not continue living my life knowing I am the reason an innocent man, Earlando M. Harrison, is wrongfully convicted for something he did not do.
>
> . . . I sign this affidavit on this date 2–22–17 and time 3:10, without being forced, threatened, nor offered anything in return[] at all. I want to clear an innocent man and do right by God and myself.

(ECF No. 1, at 16 (ellipses in original).)[11]

With respect to how Harrison obtained Shelton's affidavit, he explains that he "received it in the mail" from an attorney. (ECF No. 15, at 3; ECF No. 15–1, at 3.) Harrison further explains that "[t]he affidavit was notarized on February 22, 2017," but

---

[11] The affidavit is typed and includes blank lines in which Shelton handwrote his name, the date, and the time. (ECF No. 1, at 16.)

he "was not aware of its existence nor was it in [his] possession until April 2, 2017."

(ECF No. 15, at 3.) Harrison also submits a letter he received from an attorney,

Benjamin M. Mason, which is dated March 29, 2017, stating, in pertinent part:

> A former client of mine who indicates that he may have met you at the Hampton Roads Regional Jail has brought to me an Affidavit signed by Jeremy Shelton, the alleged victim of the charges against you of malicious wounding and use of a firearm in the commission of a felony. The Affidavit indicates that you were not the person who came to the residence of Mr. Shelton and shot him on the night of July 26, 2014. This Affidavit is being sent to you at the request of my former client. I do **not** represent you on anything involving this matter nor am I interested in representing you on any claim of actual innocence.

(ECF No. 15-1, at 3 (emphasis in original).)

### D.    Reliability of Harrison's Evidence

The Supreme Court has explained that to be credible, three types of "new reliable

evidence" may support a petitioner's allegations of innocence. *Schlup*, 513 U.S. at 324.

These include "exculpatory scientific evidence, trustworthy eyewitness accounts, or

critical physical evidence—that was not presented at trial." *Id.* Harrison's actual

innocence claim is not accompanied by "exculpatory scientific evidence" or "critical

physical evidence" not presented at trial. *See id.* Further, for the reasons set forth below,

Shelton's recantation of his identification of Harrison as the shooter, which is set forth in

Shelton's affidavit, is not trustworthy, and therefore, does not constitute "new reliable

evidence." *See id.*

With respect to the reliability of Shelton's affidavit, although the affidavit is

notarized, the affidavit is not truly sworn to under penalty of perjury nor did the notary

administer an oath. Rather, the affidavit states, "I[,] Jeremy Shelton, give full truth, by

God, that the following contents to be the truth the whole truth and nothing but the truth."

(ECF No. 1, at 16.) Later, the affidavit states, "I sign this affidavit on this date 2–22–17

and time 3:10, without being forced, threatened, nor offered anything in return[] at all. I

want to clear an innocent man and do right by God and myself." (*Id.*) Such statements

fail to transform the contents of the affidavit into sworn testimony. *Price v. Rochford*,

947 F.2d 829, 832 (7th Cir. 1991) (refusing to consider documents verified in such a

manner to avoid the penalty of perjury); *Hogge v. Stephens*, No. 3:09CV582, 2011 WL

2161100, at *2–3 & n.5 (E.D. Va. June 1, 2011) (treating statements sworn to under

penalty of perjury, but made upon information and belief, as "mere pleading allegations")

(quoting *Walker v. Tyler Cty. Comm'n*, 11 F. App'x 270, 274 (4th Cir. 2001)).

Further, it is unclear why Shelton waited approximately two years after Harrison's

trial to make any attempt to recant his identification of Harrison as the assailant. *See*

*McQuiggin*, 569 U.S. at 399 ("Unexplained delay in presenting new evidence bears on

the determination whether the petitioner has made the requisite showing [of

innocence]."). Additionally, although the affidavit is signed by Shelton, it is unclear why

a third party – who is identified only as a "former client" of attorney Benjamin M. Mason

and someone Harrison "may have met . . . at the Hampton Roads Regional Jail" – had

possession of the affidavit and why the third party gave the affidavit to Mr. Mason, who

then mailed the affidavit to Harrison. (ECF No. 15–1, at 3.) Moreover, besides stating

that Shelton "gave the testimony of Mr. Earlando M. Harrison being the one who shot

[him] under the constant pressure of everyone else around [him] saying that they

believe[d] Mr. Earlando M. Harrison shot [him]," Shelton fails to provide any additional

explanation as to why other people who were not present at the shooting were "saying that they believe[d] Mr. Earlando M. Harrison shot [him]" or why Shelton lied and initially identified Harrison as the shooter. (*See* ECF No. 1, at 16.) Further, Shelton also does not identify the actual shooter. (*See id.*)

Due to the circumstances surrounding the creation of the affidavit and Shelton's omission of key information in the affidavit, the affidavit is not trustworthy and is not indicative of reliability. Specifically, Harrison has failed to provide any explanation regarding why the affidavit materialized from an unidentified third party who met Harrison in jail, the identity of the third party, and the relationship between the third party and Harrison. Further, in the affidavit, Shelton fails to explain why he waited approximately two years after Harrison's trial to author the affidavit, why he identified Harrison based on the statements of unidentified people who "believe[d] . . . Harrison shot [him]," why he lied in the first place, who did in fact shoot him, and why he provided the affidavit to the unidentified third party. (*See id.*) These circumstances do not demonstrate that Shelton's affidavit is "trustworthy" such that the affidavit constitutes "new reliable evidence." *Schulp*, 513 U.S. at 324; *see Calderon*, 523 U.S. at 559 (emphasizing that new reliable evidence is a "rarity"); *cf. United States v. Lighty*, 616 F.3d 321, 375 (4th Cir. 2010) ("Post-trial recantations of testimony are 'looked upon with the utmost suspicion.'" (quoting *United States v. Johnson*, 487 F.2d 1278, 1279 (4th Cir. 1973))); *Carter*, 2010 WL 331758, at *4–6 (citations omitted) (finding that the timing and circumstances surrounding the creation of an accomplice's affidavit asserting the petitioner's innocence were relevant in determining the trustworthiness and reliability of

28

the affidavit). Thus, in light of the unreliable provenance of the affidavit, Harrison has not met his burden of producing new reliable evidence of his innocence, and the Court need not proceed to the second part of the inquiry for Harrison's gateway actual innocence claim. *See Hill*, 2010 WL 5476755, at *5 (citing *Weeks*, 119 F.3d at 1352–53; *Feaster*, 56 F. Supp. 2d at 610).

Nevertheless, despite the Court's doubts about the reliability of the affidavit, even considering this new evidence, as well as the evidence put forth at trial and the cell phone records that were provided to the Circuit Court before sentencing and included with Harrison's petition for a writ of actual innocence filed in the Court of Appeals of Virginia, many a reasonable juror would have found Harrison guilty. *See Sharpe*, 593 F.3d at 377.

### E. Consideration of All of the Evidence

The sum of the new evidence that was not presented at Harrison's trial is Shelton's affidavit and Harrison's cell phone records. In Shelton's affidavit, he states: "I lied on Mr. Earlando M. Harrison about him being the person who came to my residence and shot me the night of July 27, 2014."[12] (ECF No. 1, at 16.) Shelton also states: ". . . I seen for myself who the shooter was, and gave an accurate description of the real shooter in my initial statement with law enforcement." (*Id.*) Shelton does not indicate what specific description of the shooter was "accurate." (*See id.*)

---

[12] It appears that the date of "July 27, 2014" in Shelton's affidavit is a typographical error because the shooting occurred in the early hours of July 26, 2014. (*See, e.g.*, Feb. 19, 2015 Tr. 138–39.)

However, considering Shelton's affidavit and his trial testimony, the record

reflects that the initial description of the shooter that Shelton is likely referring to is the

initial description that he gave to the police at the hospital. Specifically, Shelton "told

[the police] [he] didn't know [the shooter's] name, but . . . described him" as "between

five seven and five nine," "dark-skinned, goatee, a hundred and 30 pounds." (Feb. 19,

2015 Tr. 156.) Shelton testified: "I mean, it's [Harrison's] description. I just didn't give

[the police] [Harrison's] name, because at the time I didn't know his government name. I

[knew] his slang name, . . . P. Stocks." (Feb. 19, 2015 Tr. 156.) On cross-examination,

Shelton acknowledged that he had also told an officer in the ambulance that the shooter

was "five nine to five ten." (Feb. 19, 2015 Tr. 203.) Shelton explained that he was

estimating Harrison's height, stating that Shelton is "six feet," and the shooter "was

shorter than [him], but [he] didn't have on shoes." (Feb. 19, 2015 Tr. 156–57.)

According to the arrest warrants, Harrison's height is 5 feet and 5 inches, and he weighs

150 pounds. Warrant of Arrest – Felony, *Commonwealth v. Harrison*, Nos. CR14–

1073–00, CR14–1073–01 (Va. Cir. Ct. filed July 27, 2014).

Looking at all of the evidence, the Court recognizes that Shelton's affidavit

contradicts his trial testimony. (*See* ECF No. 1, at 16.) "[W]here, as here, the new

evidence consists entirely of testimony that challenges the facts on which the prosecution

relied in obtaining the conviction, the court must carefully consider the nature of the

testimony in light of the existing record to determine whether it can be considered

reliable." *Doe v. Menefee*, 391 F.3d 147, 165 (2d Cir. 2004) (citing *Schlup*, 513 U.S. at

327–28; *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985)). As discussed

above, the trustworthiness and reliability of Shelton's affidavit is in question due to, *inter alia*, the timing of the affidavit, the reason the affidavit was authored, the circumstances surrounding the transmission of the affidavit to Harrison by a third party via the third party's attorney, Shelton's failure to explain why he lied and identified Harrison, and Shelton's failure to identify the actual shooter. *See supra* pp. 26–29. Shelton's credibility was also an issue during Harrison's trial, and defense counsel repeatedly questioned Shelton's credibility during cross-examination. (*See, e.g.*, Feb. 19, 2015 Tr. 195–96, 201–08). For example, Shelton acknowledged that he had lied to the police when he initially told them that he did know the identity of the shooter, and he acknowledged that he had lied at the preliminary hearing when he testified that he had not lied to the police. (Feb. 19, 2015 Tr. 195–96.) As aptly summarized by the Court of Appeals of Virginia, with respect to witness credibility, after hearing the evidence in the case, including the alibi testimony of Harrison and his wife, "the jury accepted the Commonwealth's evidence, and rejected the appellant's alibi defense." (ECF No. 12–2, at 2–3). Crediting Shelton's affidavit, in which he indicates that he lied when he identified Harrison as the shooter, the statements in his affidavit are essentially additional inconsistent statements for the jury to consider. (*See* ECF No. 1, at 16.)

With respect to his cell phone records, Harrison contends that the cell phone records "corroborate[] with [his] alibi, [his] testimony and the testimony of [his] defense witness during trial as to [his] whereabouts before, during and after the time Mr. Jeremy Shelton was assaulted on July 26, 2014." (ECF No. 12–4, at 6.) However, the cell phone records, which were provided by Sprint, show that that there was no activity on

Harrison's cell phone from 12:47 p.m. on July 25, 2014 until 11:08 a.m. on July 26, 2014. (*Id.* at 8.) Therefore, although Harrison contends that his cell phone records corroborate his alibi defense – that he was with his wife at their townhouse at the time of the shooting, which occurred at approximately 2:30 a.m. on July 26, 2014 – the cell phone records do *not* place Harrison at the townhouse at the time of incident. (*See* ECF No. 12–4, at 4, 8.) Instead, the cell phone records show that there was *no* activity on Harrison's cell phone from 12:47 p.m. on July 25, 2014 until 11:08 a.m. on July 26, 2014, meaning, the cell phone records do not place Harrison at any location at the time of the shooting. (*See id.* at 8.) Because the cell phone records do not place Harrison at any location at approximately 2:30 a.m. on July 26, 2014, which was the time of the shooting, the cell phone records do not demonstrate Harrison's innocence.

Thus, after considering all of the evidence, although not overwhelming, the evidence of Harrison's guilt is substantial and compelling, and the evidence of his innocence is not compelling. Specifically, considering Shelton's statements at trial and in his affidavit, the statements in the affidavit are inconsistent with Shelton's testimony at the trial that Harrison was the shooter. However, Shelton's prior inconsistent statements and admissions that he had previously lied to the police were presented to the jury. At Harrison's trial, after hearing the testimony of the Commonwealth's witnesses, including Shelton's prior inconsistent statements and admissions that he had initially lied to the police, the jury found the testimony of the Commonwealth's witnesses to be credible, and found the alibi testimony of Harrison and his wife to be incredible. Further, as previously noted, Shelton's affidavit is not trustworthy because, *inter alia*, the affidavit provides no

32

explanation as to why Shelton lied and identified Harrison as the shooter, the identity of the actual shooter, or why Shelton waited two years after Harrison's trial to author his affidavit. *See supra* pp. 26–29. Additionally, Harrison fails to provide any explanation about the circumstances surrounding the creation of Shelton's affidavit, such as the transmission of the affidavit to Harrison by an unidentified third party he met in jail via the third party's attorney, all of which is not indicative of reliability. Based on the unreliable circumstances surrounding the creation of Shelton's affidavit and the untrustworthiness of the affidavit, any reasonable juror would give substantial weight to Shelton's prior sworn statements at Harrison's trial, rather than his affidavit, which has an unreliable provenance. Further, with respect to the other new evidence in this case – Harrison's cell phone records – contrary to Harrison's assertion that his cell phone records are evidence of his innocence, the cell phone records do not place Harrison at any location because no activity was recorded on his cell phone during the hours relevant to this case. Therefore, in evaluating Harrison's current claim of innocence, any reasonable juror would give substantial weight to Shelton's prior sworn statements at Harrison's trial, including his identification of Harrison as the shooter, and would not give substantial weight to either Shelton's affidavit due to its unreliable provenance or Harrison's claim that his cell phone records establish his location at the time of the shooting.

Given the totality of the evidence, Harrison fails to demonstrate that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Sharpe*, 593 F.3d at 377 (internal quotation marks omitted) (quoting

*Schlup*, 513 U.S. at 327). Accordingly, Claim One will be dismissed. Further, Harrison's request for an evidentiary hearing will be denied.

Nevertheless, because Harrison's remaining two claims clearly lack merit, the Court turns to the merits of Claims Two and Three.

## IV. CLAIM TWO – INEFFECTIVE ASSISTANCE OF COUNSEL

In Claim Two, Harrison contends that trial counsel rendered ineffective assistance because "[a]fter being made aware of the after-acquired newly discovered evidence and supplied with a copy of it (notarized affidavit), [Harrison's] trial counsel failed to conduct an appropriate investigation or at the least, inform the proper authority of the evidence." (§ 2254 Pet. 7.)

To demonstrate ineffective assistance of counsel, a convicted defendant must show, first, that counsel's representation was deficient, and second, that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To satisfy the deficient performance prong of *Strickland*, the convicted defendant must overcome the "'strong presumption' that counsel's strategy and tactics fall 'within the wide range of reasonable professional assistance.'" *Burch v. Corcoran*, 273 F.3d 577, 588 (4th Cir. 2001) (quoting *Strickland*, 466 U.S. at 689). The prejudice component requires a convicted defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In analyzing ineffective assistance of counsel

claims, it is not necessary to determine whether counsel performed deficiently if the claim is readily dismissed for lack of prejudice. *Id.* at 697.

With respect to trial counsel's representation, trial counsel first represented Harrison at his preliminary hearing, and continued to represent Harrison at his arraignment, trial, and sentencing. (§ 2254 Pet. 13.) Harrison's trial counsel did not represent him on appeal. (*See id.*) Instead, the Circuit Court appointed a new attorney to represent Harrison during his direct appeal. *Commonwealth v. Harrison*, Nos. CR14–1073–00, CR14–1073–01 (Va. Cir. Ct. June 3, 2015). After Harrison's direct appeal, Harrison has proceeded on a *pro se* basis in all subsequent post-conviction proceedings. Harrison fails to articulate, and the Court fails to discern, how any inaction by Harrison's trial counsel with respect to Shelton's 2017 affidavit (the "after-acquired newly discovered evidence" to which Harrison refers), could have affected the outcome of Harrison's trial in 2015. *See Strickland*, 466 U.S. at 694. Harrison's terse and conclusory allegations regarding counsel's inaction *two years* after trial counsel represented Harrison fail to demonstrate deficient performance or prejudice under *Strickland*.[13] *Bassette v. Thompson*, 915 F.2d 932, 940–41 (4th Cir 1990) (requiring proffer of mitigating evidence to state claim of ineffective assistance); *see Sanders v.*

---

[13] To the extent that Harrison claims that upon learning of the "newly discovered evidence" in 2017, his trial counsel should have resumed representation of Harrison, Harrison's trial counsel was under no obligation to do so, and there is no constitutional right to have appointed counsel in post-conviction proceedings. *Mackall v. Angelone*, 131 F.3d 442, 449 (4th Cir. 1997). Moreover, although under the applicable rules of professional responsibility, attorneys have some continuing duties and obligations to former clients, attorneys are generally not obligated to re-investigate matters for former clients or to undertake actions that would essentially constitute representation of the former client. *See, e.g.*, Va. Rules of Prof'l Conduct R. 1.9 (2018).

*United States*, 373 U.S. 1, 19 (1963) (finding denial of habeas relief appropriate where petitioner "stated only bald legal conclusions with no supporting factual allegations"). Because Harrison has failed to demonstrate any deficiency of counsel or resulting prejudice, Claim Two will be dismissed.

## V. CLAIM THREE – PROSECUTORIAL MISCONDUCT

In Claim Three, Harrison contends that there was "[p]rosecutorial misconduct" because "[a]fter being made aware of the newly discovered evidence and supplied with a copy of it (notarized affidavit), the Commonwealth's Attorney . . . failed to conduct an appropriate investigation or . . . inform the appropriate authority of evidence that exonerates [Harrison] or cast[s] doubt upon the correctness of the conviction." (§ 2254 Pet. 8.)

As a preliminary matter, Harrison does not indicate when he "made" the Commonwealth's Attorney "aware of the newly discovered evidence." (*Id.*) Because Harrison states that he did not know of the affidavit's existence until April 2, 2017, the earliest date that the Commonwealth's Attorney could have had knowledge of the affidavit would be some time after April 2, 2017. (ECF No. 15, at 3.) After a criminal defendant's conviction, "the criminal defendant has been constitutionally deprived of his liberty," and "[t]he State accordingly has more flexibility in deciding what procedures are needed in the context of postconviction relief." *Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 69 (2009) (citations omitted). Therefore, Harrison's "right to due process is not parallel to a trial right," and he has "only a limited interest in postconviction relief." *Id.* (citation omitted) (explaining that with respect to

postconviction relief, the relevant question is only whether "the framework of the State's procedures for postconviction relief 'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental,' or 'transgresses any recognized principle of fundamental fairness in operation'").

Here, Harrison contends that the failure of the Commonwealth's Attorney to investigate or otherwise report "evidence that exonerates [Harrison] or cast[s] doubt upon the correctness of the conviction" to "the appropriate authority," which was discovered by Harrison *after* his conviction, constitutes prosecutorial misconduct. (§ 2254 Pet. 8.) However, after Harrison's conviction, the Commonwealth's Attorney was not obligated to investigate, or even disclose, potential exculpatory evidence. *Cf. Osborne*, 557 U.S. at 69 (concluding that in the postconviction context, "*Brady* [*v. Maryland*, 373 U.S. 83 (1963)] is the wrong framework"). Accordingly, Claim Three will be dismissed.

## VI. CONCLUSION

For the foregoing reasons, the Motion to Dismiss (ECF No. 10) will be granted. Harrison's request for an evidentiary hearing (ECF No. 15, at 5) will be denied. Harrison's claims will be dismissed, and the § 2254 Petition (ECF No. 1) will be denied. A certificate of appealability will be denied.

An appropriate Final Order shall accompany this Memorandum Opinion.

/s/

HENRY E. HUDSON
SENIOR UNITED STATES DISTRICT JUDGE

Date: Jan. 31, 2019
Richmond, Virginia